**Brenda PARTON, Plaintiff,**

v.

**GTE NORTH, INC., a Wisconsin Corporation, Defendant.**

**No. 89–4352–CV–C–66BA.**

United States District Court, W.D. Missouri, C.D.

April 8, 1991.

David A. Masters, Macon, Mo., Marjorie Bedrick Tarkow, Columbia, Mo., for plaintiff.

David B. Rogers, Law Offices of David B. Rogers, Columbia, Mo., for defendant.

## ORDER

KNOX, United States Magistrate Judge.

### I. Introduction

Plaintiff, Brenda Parton, filed this Title VII[1] action on August 18, 1989, seeking reinstatement to her former position as installer-repairman, back pay, lost benefits, seniority, an injunction against certain employment practices, and attorney fees. Upon consent of the parties, this case was transferred to the United States Magistrate Judge to conduct all further proceedings and to enter judgment, pursuant to the provisions of 28 U.S.C. § 636(c). A bench trial was held on September 26 through 28, 1990.

### II. Claims

Plaintiff alleges that during the course of her employment at GTE North, Inc., she was subjected to continued and unwelcome sexual harassment from her supervisors and coworkers, and that she was ultimately fired on January 22, 1988, because of her gender. Plaintiff also claims that she was subjected to derogatory and lewd remarks, lewd behavior, degrading work assignments not assigned to men in the same position, and discipline practices more stringent than those applied to male employees. Plaintiff alleges her work was subjected to a much higher degree of scrutiny than that of fellow employees, and that male employees escaped discipline for conduct similar to that for which she received repeated discipline. She alleges supervisory officials were aware of the abuse to which she was subjected, and yet failed to take effective action to prevent or mitigate such abuse. She states policies adopted to deal with sexual harassment were ineffective and resulted only in a perpetuation of the harassment.

In summary, plaintiff claims (1) defendant maintained a sexually discriminatory, hostile work environment that adversely affected the terms, conditions, and privileges of her employment, in violation of Title VII, and (2) fired her because she was a woman.

Defendant contends plaintiff was terminated for violating the company's standards of integrity (lying to her supervisors) and poor work performance. Defendant claims that plaintiff had been a marginal employee for years; that until recently, she had a major absentee problem; frequently failed to comply with company standards and policies; and was finally discharged for poor work performance and lying about a repair job at a customer's home at 1700 Princeton Drive. Defendant asserts that to the extent plaintiff's work was more closely scrutinized than others', it was because she had such a long history of discipline problems. Defendant states gender played no part in its decision to discharge plaintiff and that a sexually hostile work environment did not exist. All of the incidents with supervisors and fellow workers, except as otherwise noted, occurred at the LeMone warehouse, which was operated by defendant.

### III. Findings of Fact

Plaintiff is a white female citizen who at all relevant times, resided in Columbia, Missouri. Defendant is a licensed corporation doing business in Missouri, and has an office in Columbia, Missouri, out of which it conducts the business of providing telephone service for customers in the Central Missouri region. Defendant's chief executive in Missouri is Richard E. Morgart, Division Manager. (Tr. 3, 150.)

Plaintiff was employed by defendant from April 27, 1973, until January 22, 1988. (Tr. 2, 22–23.) From September 26, 1976, until January 22, 1988, plaintiff was a member of defendant's installation and repair (hereinafter "I and R") department. Plaintiff was the first female to be em-

---

1. Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. (hereinafter "Title VII"). Plaintiff did not assert a claim under 42 U.S.C. § 1983 or a pendant state claim.

ployed by defendant in this capacity, although others later followed. (Tr. 2, 23; 3, 74.) Plaintiff was a member of the International Brotherhood of Electrical Workers Local 257 (hereinafter "Union"), which had a collective bargaining agreement with defendant, that included procedures for grieving unfair treatment and harassment. (Tr. 2, 107; 3, 61.) Jerry Haddock, Facility Maintenance Supervisor, was plaintiff's immediate supervisor at the time of her termination and for the three and one-half years preceding it. (Tr. 2, 142.) In January, 1988, Haddock reported to Mike Hoover, Service Facilities Manager, who reported to Richard Morgart. (Tr. 1, 33; 3, 149.)

Plaintiff had a lengthy disciplinary record with GTE, containing numerous disciplinary letters, memoranda, and records of counseling sessions. (Defendant's Ex. "A.") In order to appreciate the nature of plaintiff's performance in conjunction with her claims, this court will summarize her work history and incorporate her complaints of sexual discrimination and harassment.

1974

Plaintiff started working for defendant on April 27, 1973. She received her first formal discipline letter on October 14, 1974. This letter, signed by Central Office Maintenance Supervisor C.R. Fromm, documented a meeting between plaintiff, Fromm and a union steward to discuss plaintiff's "poor attendance and tardiness records." Plaintiff was warned that further discipline would be taken if she did not improve her tardiness record.

1975

On March 12, 1975, Fromm issued plaintiff another letter concerning incidents in which she arrived late for work. On this occasion, plaintiff was sent home with pay.[2] Plaintiff was warned to improve or face possible suspension or termination.

On October 2, 1975, Supervisor Mack Torres gave plaintiff a written reprimand for taking work orders home, thus, causing delay of service to some customers.

Torres called this a "serious mistake" and threatened plaintiff with further discipline if she were to do this again.

On October 8, plaintiff received a letter warning her to improve her attendance, which cited plaintiff's tardiness in arriving for work that morning.

Plaintiff's next disciplinary letter, dated December 3, 1975, and signed by Ron Fager, Service Facilities Supervisor, was for tardiness and unexcused absences. She was suspended for two days without pay.

1976

On March 23, 1976, plaintiff was reprimanded for an absence from work. Plaintiff had failed to secure her supervisor's approval for a shift trade arrangement she had made with another employee. The letter was signed by R.E. Hopwood, Division Service Manager.

On June 23, a letter from Torres documented a consultation with plaintiff in which she was warned to provide a doctor's report the next time she was absent from work due to illness.

By letter of December 13, W.L. Barnthouse, Installation and Maintenance Supervisor, reprimanded plaintiff for two incidents of reporting to work late. Plaintiff was warned of the possibility of suspension or termination if she did not improve.

1977

Plaintiff received a letter on November 22, 1977, indicating she had an "excessive amount of absent time" for the first eleven months of the year. The letter documented plaintiff's seventeen absences to date in 1977 and was signed by Mike Green, I & M Supervisor. Plaintiff was warned of the potential for suspension or termination.

1978

On January 13, 1978, Green reprimanded plaintiff for incidents of tardiness occurring since the November 22, 1977, letter.

On April 3, Green "counseled with Brenda about her absenteeism and her tardiness."

---

**2.** It appears odd that plaintiff would be punished by being sent home "with pay," but that is

what the record reflects.

On August 14, plaintiff was sent a memorandum documenting her 115–¼ hours of absent time from January 12 to August 8.

On December 29, plaintiff was suspended for one day without pay due to a work stoppage on December 15 and 16. The stoppage was viewed by Green as a "serious breach" of plaintiff's obligations under the collective bargaining agreements.

1979

By letter of January 4, 1979, Green reprimanded plaintiff for tardiness and warned her of the potential for stronger action to be taken.

On February 26, plaintiff was disciplined by Robert Carey, I & M Service Facilities Supervisor, for poor attendance and tardiness. Carey noted plaintiff had been absent for 186–½ hours in 1978. The possibility of termination was mentioned.

On April 18, plaintiff was praised in a letter from Carey for having only two absences between February 26 and April 17. This was seen to be an improvement.

On October 25, Jim Norton, an I & M Supervisor, reprimanded plaintiff by letter for having ten absences between May 18 and October 22.

On December 24, plaintiff was reprimanded for spending too much time on one job to the exclusion of others, without calling in.

1980

On January 9, 1980, a memorandum was entered in plaintiff's file indicating she had gone home sick because of gasoline fumes in her truck, but tests later revealed no such fumes.

On July 10, Larry Kelsay, an I & M Supervisor, reprimanded plaintiff in a letter for her continued absenteeism. Plaintiff was warned of the possibility of termination.

On December 30, plaintiff received a performance appraisal review, listing her as "poor" in the areas of work habits and judgment. The appraisal cited an incident where plaintiff made a mistake which resulted in an angry customer.

Plaintiff testified that during 1980, a fellow employee named Bill Levacy made hand motions as if to grope plaintiff's breasts when she approached him. (Tr. 2, 39.)

Plaintiff also testified to being assigned to a so-called "cross-training" program during the same year by her supervisor Mike Green. The assignment, which was supposed to benefit plaintiff, consisted only of "wrecking out" an abandoned plant. Accompanying plaintiff on this undesirable assignment was Wendell Bagby, a black employee.

1981

On July 28, 1981, plaintiff received a letter of reprimand concerning an unexcused absence. Plaintiff had indicated she would work an extra day due to storm damage, but failed to show for the shift. The letter was signed by Norton. Plaintiff was warned she might be terminated for future unexcused absences.

On August 13, plaintiff was warned by Supervisor Ron Freeman that failure to improve on future performance appraisals would result in her being reassigned to a different department.

On September 14, plaintiff received a disciplinary letter for her involvement in a minor traffic accident. Plaintiff was found to have acted in an unsafe manner, and was warned that future such incidents could result in termination.

Plaintiff received another letter on December 7. This letter concerned her parking her vehicle in an unsafe location, which resulted in the vehicle being reported as stolen and caused a security investigation to ensue. In the same letter, plaintiff was directed to keep more accurate time records. The September and December letters were signed by Freeman, I & M Supervisor.

Plaintiff testified that Gary Vogelweid asked her when she was going to get married. Gary Vogelweid admitted to asking plaintiff when she was going to get married, but stated he did so only after plaintiff asked him when he and his wife were going to have more children. (Tr. 3, 122.)

Plaintiff testified that in 1981, her supervisor, Larry Kelsay, asked her at the warehouse when she was "going to quit this job and get married." (Tr. 2, 35.)

Plaintiff also stated Kelsay once got into her personal belongings and read a letter she had begun writing to a friend. (Tr. 2, 38.)

Plaintiff further testified that in approximately 1981, Kelsay instructed plaintiff to clean toilets during a slow period, while male I and R employees were instructed to stock their trucks. (Tr. 2, 36–37.)

1982

Plaintiff received a disciplinary letter on November 1, 1982, detailing her multiple absences and tardiness accumulated that year, and warning her that failure to improve could result in her termination. This letter was signed by Vogelweid, Dispatch Supervisor.

1983

On January 26, 1983, plaintiff was called for a counseling session with Vogelweid, her supervisor. The memorandum of this conference indicates that GTE had received complaints from customers on three jobs plaintiff had performed that month. A fourth job, where apparently substandard work had been performed, was also discussed. Plaintiff was told to improve the quality of her work or face discipline.

On November 25, plaintiff received a disciplinary letter for her involvement in a minor accident. Plaintiff was backing from a parking space and hit a concrete wall. In the letter, Vogelweid warned plaintiff she might be terminated for future such incidents.

1984

By disciplinary letter of May 4, 1984, plaintiff was suspended for two days, without pay, in an effort to impress upon her the "seriousness" of her attendance and tardiness problems. The letter, signed by Vogelweid, cited numerous absences which had occurred in 1984.

On June 11, a memorandum was entered in plaintiff's file concerning a counseling session between plaintiff, Vogelweid, and Mike Hoover (Vogelweid's supervisor).

The incident involved plaintiff taking an excessive amount of time to complete a routine job, failing to record her time correctly, and taking too much time for lunch. Plaintiff was told to improve in these areas.

On September 10, plaintiff received another disciplinary letter concerning her absences and tardiness. This letter was signed by Gerald Haddock, plaintiff's new supervisor, and plaintiff was warned of the potential for termination.

1985

Haddock issued plaintiff a disciplinary letter on February 6, 1985, concerning her high absenteeism. Plaintiff was given the usual warnings, and it was noted that plaintiff had exceeded the company policy for absenteeism.

On March 11, plaintiff was given a one-day suspension by Haddock, without pay, for a series of poorly completed jobs. Plaintiff or her supervisor had to return to these jobs to correct the work.

On October 22, plaintiff met with Mike Hoover, Dale Adams, and Jerry Haddock to discuss her attendance problems. Plaintiff was shown her attendance records, indicating she had a five percent absentee rate, which was well over the company standard of two percent. Plaintiff was told of the difficulties this caused defendant and plaintiff's coworkers, and was warned to improve drastically because she was "on the verge of termination." The memorandum of this discussion was signed by Hoover.

Plaintiff testified that in 1985, she was required to attend pole-climbing school a second time, although she had already satisfactorily completed this training earlier. She was unaware of anyone else who had been sent to pole-climbing school for a second time. (Tr. 2, 43–44.) Defendant asserts plaintiff was required to attend this training a second time because of her fear of pole climbing. (Tr. 2, 88; 1, 206.) Sally Sappington, also a GTE I and R employee, testified she has never known of another employee with plaintiff's experience who was sent to pole-climbing school for a second time. (Tr. 1, 117.) One of plaintiff's

witnesses corroborated defendant, however, when he said he had observed that plaintiff would go home sick if she were assigned a job which required her to climb poles. (Tr. 1, 206.)

Plaintiff also testified that sometime between 1985 and 1987, Gary Vogelweid stated to plaintiff in the presence of others, "You're getting fat, aren't you?" (Tr. 2, 33.)

1986

On July 3, 1986, plaintiff received a one-day disciplinary suspension for her involvement in a vehicular accident. This action was taken by Jerry Haddock.

1987

On March 9, 1987, plaintiff was issued a disciplinary letter for attendance problems, warning her she was in a "very precarious situation" and could be terminated for failure to improve in this area. This was signed by Haddock.

On July 14, plaintiff received a disciplinary letter from Haddock, for being "out-of-route"[3] on a previous occasion, and for not keeping accurate records of her location and time. On December 22, Haddock issued plaintiff another "out-of-route" disciplinary letter.

Plaintiff testified that in December, 1987, she requested a transfer to another supervisor's crew because of the extreme pressure she was experiencing working for Jerry Haddock. Haddock's supervisor, Mike Hoover, denied her request. Haddock testified that he believed plaintiff wanted off his team because she thought he was too strict with her. (Tr. 3, 244.) He did not want plaintiff to escape appropriate discipline by transferring to a new crew. (Tr. 3, 29.) Defendant concedes that plaintiff was denied a transfer because it appeared she wanted to be on a crew with an easier supervisor. (Tr. 3, 242–44.)

DeWayne Hause, who performed contract work for GTE at various times, testified that during a telephone conversation in 1987, Haddock expressed his belief that women were "out of their place" working in I and R, and that it "wouldn't work out"

to keep placing women in that department. (Tr. 1, 218.) Hause stated Haddock told him he was going to "get rid of them," referring to women in I and R. (Tr. 1, 219.) Hause believed Haddock's supervisors knew of his views because everyone seemed to know, and Haddock took no steps to hide them. (Tr. 1, 221.) These conversations were denied by Haddock.

Plaintiff testified Haddock made a spectacle of her by calling her in front of a group assembled in the ready room to issue her a yellow safety strap. This type of strap was used by I and R employees choosing to climb ladders rather than poles. (Tr. 2, 42.) Plaintiff testified many employees used ladders, but were not issued the safety strap at the morning meeting. *Id.* Defendant claimed the yellow nylon ladder straps were new pieces of safety equipment which were issued for testing to three people who used their ladders frequently. (Tr. 2, 89.)

Plaintiff also testified that Tom Carr, a supervisor, once tried to discourage her from becoming an I and R technician and on another occasion, asked Jerry Haddock if he could borrow his "girl" for a "dirty job," to which Haddock agreed. (Tr. 2, 48.)

Incidents For Which a Date is Not Available

Plaintiff also presented evidence concerning the following incidents. It is not clear from the evidence *when* these events occurred.

Plaintiff elicited much testimony concerning the linemen, nicknamed the "animal crew," who worked out of defendant's LeMone warehouse. They had a rough appearance and behavior. Plaintiff did not work directly with this all-male crew, but was exposed to them for brief periods each day. Mary Wilson, an employee of defendant, typified the testimony of other witnesses in stating these workers used much obscene language and could be very offensive. Wilson testified plaintiff's supervisors were aware of the linemen's conduct

---

**3.** "Out-of-route" means straying from dispatched assignments; going out of the way.

and did nothing to stop it. (Tr. 1, 130–31.) There was no evidence these employees directed their conduct specifically toward plaintiff or other females or that plaintiff worked with them.

There was also testimony that sexually explicit cartoons and drawings were regularly present in the warehouse where plaintiff and other women worked. (Tr. 2, 110–11.) Although the details of those cartoons were not remembered by witnesses or divulged at trial, some witnesses testified they were of a sexually offensive nature, and that they were commonplace, even on the ready-room[4] bulletin boards. There was testimony that the cartoons were removed by supervisors when found on the bulletin boards, and were thrown away in front of the work group. There was not much effort made to discourage future cartoons. (Tr. 3, 247.) There is no evidence that any cartoons were specifically directed at plaintiff. One female witness described the cartoons as "juvenile" and stated she threw them away.

Plaintiff testified that on one occasion, she overheard supervisor George Carney stating women on the television show "Tour of Duty" should be depicted giving servicemen "blow jobs." Plaintiff testified this was spoken in the presence of plaintiff and other women. (Tr. 2, 34–35.) Carney, however, denied making this statement (Tr. 3, 143–44).

Plaintiff also introduced evidence concerning Cheryl Crane, a female employee who had earlier brought internal charges against her supervisor for sexual harassment at the LeMone warehouse. (Tr. 3, 195–205.) The records were offered at trial, but there was no oral testimony about the incident.

Plaintiff also testified to being treated coldly by her fellow employees, and there was testimony that betting took place over how many minutes late she would be in reporting for work in the morning. (Tr. 2, 38; 2, 26; 1, 45.) Plaintiff states she would be ridiculed for arriving late to work alone, but not if she were accompanied by male employees who were also late. (Tr. 2, 46.) Plaintiff admitted she usually arrived just on time and that she was rarely early.

Nancy Knight testified that when she got married, a group of employees took up a collection and hired a male stripper to perform for her at the office. Photographs were introduced in evidence. Knight says this upset her. The "stripper" wore a G-string. Female employees contributed to hiring the young man.

Finally, Jerry Haddock admitted to distorting plaintiff's name by referring to her as "Brender." (Tr. 2, 199.) Cliff Barker, a coworker of plaintiff, testified Haddock used this nickname to refer to other employees' mistakes. The nickname came to be associated with substandard work, and it was clear to those who heard it that the name referred to plaintiff. (Tr. 1, 197.)

Plaintiff and her witnesses testified that in all of the above-cited incidents, supervisory officials were aware of the conduct and did nothing to stop it.

Incidents Immediately Preceding Discharge

*The incidents shortly preceding plaintiff's termination are as follows:* On December 17, 1987, Jerry Haddock attempted to locate plaintiff to discuss with her miscoded "job tickets" from an assignment in Ava, Missouri.[5] Haddock was unable to locate plaintiff where he thought she should have been. (Tr. 2, 150.) Plaintiff's first assignment that day was a third party report of a busy signal. At 7:30, plaintiff left the LeMone warehouse (east of Columbia) and drove to defendant's west Columbia office to call the customer, who lived in north Columbia. (Tr. 2, 55, 57.) This placed plaintiff approximately seven to eight miles out of her way, because the call could have been placed at the LeMone warehouse. (Tr. 2, 148.) Plaintiff's next assignment was at 1700 Princeton Drive (hereinafter "Princeton") at 8:30 to correct static on a line. (Tr. 2, 58.) Haddock did

---

**4.** The room in which I and R employees prepare for dispatch to the day's assignments.

**5.** "Miscoding" refers to a situation in which the wrong codes are used to denote work performed; this interferes with accurate recordkeeping.

not locate plaintiff at that location, but caught up with her at her job on Third Avenue at 10:40. (Defendant's Ex. "B–1.") On her way to this job, plaintiff had taken a 15–minute break at the Stadium Drive McDonald's. Haddock issued plaintiff a three-day suspension for being out-of-route, based on plaintiff going out of her way to call her first customer and for stopping at the Stadium McDonald's, which was not en route to her next job. (Tr. 2, 156.) This was plaintiff's third out-of-route incident in less than one year. *Id.* Plaintiff grieved her suspension, which was denied at the first level. (Tr. 2, 168–69.) Plaintiff was granted a second-level grievance hearing in January, 1988, attended by herself and others, including Phil Butts, a union official who represented her, Jerry Haddock, Mike Hoover and Richard Morgart. (Tr. 2, 93; 2, 169.) Plaintiff's second-level grievance was also denied. During the second-level hearing, Richard Morgart became concerned with the timing of the events of December 17, 1987, and questioned what work plaintiff had completed at Princeton because Haddock had been unable to locate her there. (Tr. 3, 152–54, 191.) Plaintiff stated at the hearing that she had found a crushed wire in the attic of Princeton which she repaired by splicing.[6] (Tr. 1, 69; 2, 171; 3, 89.) Morgart then sent Haddock and Bill Vaughn, a union representative also present at the second-level hearing, to conduct a "quality inspection" of the work performed by plaintiff at Princeton. (Tr. 2, 170; 3, 89, 154.) Upon inspection, Haddock and Vaughn found the attic as plaintiff had described it, but found a *cut* wire which terminated service to a telephone jack, rather than a *spliced* wire, which would have left the jack operational. (Defendant's Ex. "H," Tr. 2, 172.) The cut wire led to a corroded jack in the basement, believed by them to be the source of the static. (Tr. 2, 174–76.) Proper repair would have been to replace the jack in the basement, not cut the wire in the attic. Reinstatement of service to the basement jack was much more difficult after wires were cut in the attic. Haddock and Dale

Adams, another GTE employee and union representative, ultimately repaired the customer's trouble at Princeton by replacing the corroded jack and making a new splice in the attic. This was done at the direction of Mike Hoover. (Tr. 2, 177.) Hoover and Haddock confronted plaintiff with the cut wire and corroded jack. Bill Vaughn was present. Plaintiff responded she should not have said anything at the second level grievance hearing about the work she had performed at Princeton. (Tr. 2, 180.) Haddock and Hoover then recommended to Richard Morgart that plaintiff be fired (Tr. 2, 180; 3, 150.) Morgart agreed and plaintiff was terminated by letter of January 22, 1988, signed by M.L. (Mike) Hoover, and specifying a violation of standards of integrity and poor work performance as the reasons therefor. (Defendant's Ex. "A.") The vacancy created by plaintiff's termination was filled by Steve Smith, who is the brother-in-law of Jerry Haddock's wife. (Tr. 3, 59–60.) He was next in line for an opening and the fact of his relation to Haddock played no part in his selection or in plaintiff's discharge.

### IV. Discussion

Plaintiff's discriminatory termination and hostile environment claims will be considered separately.

#### A. Gender-based Termination

To prove her case, plaintiff must prove she was discharged and that her gender was a determining or motivating[7] factor in the decision to discharge her.

■ To establish a *prima facie* claim under Title VII of the Civil Rights Act of 1964 for sexually discriminatory termination, a plaintiff must show that (a) she is a female; (b) she was performing capable work; (c) she was terminated despite her capabilities; and (d) her position was thereafter open to applicants with her capabilities or was filled by a man of lesser or equal abilities. *Gray v. University of Arkansas at Fayetteville*, 883 F.2d 1394, 1398

---

6. "Splice" refers to a procedure where two wires are joined to form one connection.

7. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

(8th Cir.1989); *Osborne v. Cleland,* 620 F.2d 195, 198 (8th Cir.1980) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

■ Once the plaintiff establishes a *prima facie* case, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for the discharge. *Gray v. University of Arkansas at Fayetteville,* 883 F.2d at 1398. If this is done, then plaintiff is given an opportunity to prove, by a preponderance of the evidence, that the legitimate reason offered by the defendant was merely a pretext for discrimination. *Id.; Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). If there is direct evidence of a discriminatory purpose, the burden remains on defendant to establish that gender played no part in the decision to discharge plaintiff.[8]

The parties do not seriously dispute that plaintiff has established a *prima facie* case of discriminatory firing. Thus, the burden is on defendant to articulate a legitimate reason or reasons for terminating plaintiff.

Defendant has proffered evidence to show that plaintiff's termination was based on the incidents of December 17, 1987, lying about them at a hearing, and plaintiff's lengthy disciplinary record. This is substantial evidence that defendant had legitimate and nondiscriminatory reasons for terminating plaintiff. Thus, the burden returns to plaintiff to show by a preponderance of the evidence that defendant's articulated reasons are merely pretextual, or that plaintiff was actually discharged because of her gender.

■ The records detailing the many instances in which plaintiff was reprimanded for performance and attendance problems were not refuted by plaintiff. Many of these were from supervisors whose integrity for sexual bias was never questioned. *See,* e.g., Defendant's Ex. "A." Her absenteeism was not explained, other than to suggest she had improved dramatically by the time she was fired. Plaintiff also argued that her absentee rate when fired was better than that of some male employees. However, no other employee was shown to have an absentee or discipline record over a period of years that even closely matched that of plaintiff. Defendant outlined at trial the procedure by which plaintiff was terminated, including a showing that Richard Morgart, defendant's chief executive for Missouri, made the ultimate and final decision to fire plaintiff. There simply is, in this case, a substantial record of employee failings, concluding with the incidents of December 17, 1987, and their attempted cover-up by plaintiff, which forces the court to conclude that *even if* plaintiff's gender had played some unidentified role in her termination, defendant would have fired her even *had it not* considered gender a factor. *See Price–Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 1795, 104 L.Ed.2d 268 (1989).

Plaintiff presented much testimony relating to the close supervision of her by supervisors, primarily Jerry Haddock, some of which may have been gender-motivated. On the one hand, plaintiff's evidence appears to show certain incidents for which plaintiff was reprimanded for seemingly minor matters. Plaintiff's discipline rec-

---

**8.** *Price–Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). It does not matter whether this case is viewed as presenting direct or circumstantial evidence of sexual discrimination involving plaintiff's termination, because the result would be the same. Direct evidence "must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question." *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 569 (7th Cir.1989). Here, plaintiff has presented no direct evidence that she was fired based on gender, such as a statement from one of defendant's agents that plaintiff herself had been or would be fired because she is a woman. Further, as noted in *Price–Waterhouse,* "[r]emarks at work that are based on sex stereotypes do not inevitably prove that gender played a part in a particular employment decision." *Price–Waterhouse,* 490 U.S. at 251, 109 S.Ct. at 1791. It has also been held that evidence of discriminatory statements is not "direct evidence" of causation if an inference is required. *Furr v. AT & T Technologies, Inc.,* 824 F.2d 1537, 1549 (10th Cir.1987). There is some direct evidence of sexually stereotypical attitudes, but it is clear to this court, no matter who has the burden of proof that plaintiff was discharged for reasons unrelated to her gender. Thus, the burden of proof is really irrelevant.

ords reveal, for example, that she had been reprimanded for taking her morning break at the *wrong* McDonald's, placing her slightly out-of-route; that Haddock vigorously pursued her from job to job to discuss the miscoding incident from the Ava, Missouri, job; and that he personally came to the scene of one or more of plaintiff's minor vehicular accidents. These incidents tend to create an impression that Haddock was scrutinizing plaintiff more closely than other employees. Viewed in context with all the evidence presented, however, plaintiff's evidence of close scrutiny does not convince the court that such was done because of her gender. Her activities understandably were more closely watched because of her record of disciplinary problems, which started long before Haddock became her supervisor. Given this and plaintiff's failure to claim the disciplinary records were false, the court does not find Haddock's or other supervisors' close supervision of plaintiff to be any indication of a desire to terminate plaintiff because of her gender. Marginal employees who regularly take advantage of, and bend, the rules should not be surprised to find they are watched more closely than other employees or fired if they lie to their supervisors about the work they did.

Plaintiff must persuade the court that defendant would not have terminated her but for her gender. *Price–Waterhouse v. Hopkins.* This may be done by showing a gender-based discharge or by showing that defendant's asserted legitimate reasons for terminating plaintiff are merely pretextual. *Texas Dept. of Community Affairs v. Burdine.* While plaintiff has presented evidence of inappropriate conduct on the part of certain supervisors and co-employees, the court does not believe the reason for plaintiff's discharge was due to her gender. It is a credibility decision on the reason for the discharge. Much of plaintiff's evidence concerned stereotypical attitudes toward women in traditionally male positions and comments which are offensive to women generally. These comments and attitudes had little, if anything, to do with plaintiff's discharge. This court finds that Mr. Morgart made the ultimate decision to fire plaintiff based on his belief that she had lied to him in the second-level grievance hearing concerning the work she had performed at the Princeton job, her being out-of-route on that day, and her overall poor performance and absentee record. (Tr. 3, 155.) The termination letter cited "violation of the company's standards of integrity" and "unsatisfactory work performance" as the basis for termination. (Defendant's Ex. "A.") Plaintiff unsuccessfully grieved her termination through three levels of proceedings. (Tr. 3, 84–90.) This court places no weight on the fact that the union declined to pursue the grievance procedure and arbitration. Plaintiff has failed to prove she was terminated because of her gender in violation of Title VII and thus, is not entitled to prevail on that claim or to the remedies of reinstatement, back pay, restoration of seniority, and benefits.

**B. Hostile Work Environment Claim**

Plaintiff next claims she was subjected to a sexually hostile work environment.

Although sexual harassment may take a variety of forms, courts have consistently recognized two distinct categories of sexual harassment claims: *quid pro quo* sexual harassment, and hostile work environment sexual harassment. *Quid pro quo* harassment occurs when submission to sexual conduct is made a condition of concrete employment benefits. Alternatively, hostile work environment harassment arises when sexual conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." "For [hostile work environment] sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. (Citations omitted.)

*Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1413 (10th Cir.1987). Plaintiff does not

allege she was subjected to *quid pro quo* sexual harassment.

■ In order to prevail on her claim of a sexually hostile work environment, in violation of Title VII, plaintiff must prove (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a "term, condition, or privilege" of employment; and (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action. *Moylan v. Maries County*, 792 F.2d 746, 749 (8th Cir.1986). *See also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

A recent case suggests the evidence must be considered from the perspective of the "reasonable woman," *Ellison v. Brady*, 924 F.2d 872 (9th Cir.1991). Whether that standard is used, or the approach of looking at the events from the perspective of a "reasonable person" under similar circumstances, *see Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 620 (6th Cir.1986) (a gender-neutral classification), it appears there existed a hostile environment toward plaintiff which was, in part, based on her gender.

First, there is no dispute that plaintiff is female, and thus belongs to a protected group.

Second, plaintiff was subjected to unwelcome harassment, based on her sex, at various times during her years with GTE. Plaintiff's evidence concerning Jerry Haddock's statements and actions, and those of others, lead to an inference that plaintiff was the subject of some degree of sexual harassment, ridicule and teasing because she was a woman in a traditionally male-dominated field. The evidence included incidents such as

1. Groping at plaintiff's breasts by Bill Levacy.

2. Being assigned to wreck out an abandoned plant and calling it training.

3. Reading of plaintiff's personal letter by Supervisor Kelsay.

4. Being assigned by Supervisor Kelsay to clean toilets while male employees were required to stock their trucks.

5. Statements by Haddock that women are out of place in I and R.

6. Statements by Supervisor T. Carr that attempted to discourage plaintiff from becoming I and R technician and request to J. Haddock to borrow his "girl" for a "dirty job."

7. Lack of effort to control the language of the linemen, a.k.a. animal crew.

8. Posting of sexually-explicit cartoons and a lack of effort to discourage such activity.

9. Statement of a supervisor regarding "blow jobs."

10. Sexual harassment of co-employee, Cheryl Crane, by a supervisor and minimal public reprimand of the supervisor as a result.

11. Referring to mistakes as "brenders."

Some of these incidents may not have been sexual harassment, but harassment for other reasons. For example, the "brender" comments are exceptionally inappropriate for a supervisor to make or allow, but are not necessarily gender-based harassment. Mr. Haddock may have done the same thing to a male employee with a record identical to plaintiff's. People who do not perform to company standards and who frequently arrive late for work are often joked about by other employees and their supervisors.

However, plaintiff's supervisor, Jerry Haddock's own testimony, revealed a stereotypical view of women as knowing less about home construction, mechanics and electrical concepts, and requiring more supervision and education. Furthermore, supervisory officials were aware of much, if not all, of the inappropriate conduct and committed some of it themselves. There is no evidence that plaintiff contributed to or welcomed the harassment, or that any real effort was made to stop or discourage the above conduct.

Plaintiff did not file complaints while employed by defendant that she was being

harassed. (Tr. 2, 94.) She did not allege sexual harassment or discrimination during the various grievance hearings of her suspension and termination. She never complained to Phil Butts, IBEW Business Agent, who discussed sexual harassment in monthly union meetings during the period of time plaintiff was employed by defendant and who asked members to talk to him if they felt they were being harassed. (Tr. 3, 96.) Only after the grievance of her termination was finally denied and after the union declined to take her case to arbitration did plaintiff complain of sexual harassment and discrimination. Plaintiff also never complained prior to this lawsuit about the LeMone warehouse being a hostile environment for women to work. It is not surprising plaintiff did not complain, considering plaintiff's tenuous work record and her desire not to risk losing the high pay associated with her job.

Taken together, however, the above statements and actions compel the conclusion that, during plaintiff's career with GTE, plaintiff was the target of sexually based, unwelcome harassment. It is also clear plaintiff's immediate supervisors knew of this harassment, because plaintiff testified she told them, and in several instances it was plaintiff's supervisors themselves who were engaging in the harassment. Furthermore, some of the instances were so wide-spread, like the cartoons, that high level supervisors must have known. They also knew of the incident involving Cheryl Crane and did little to convey the message that such conduct was reprehensible. Defendant's response to known instances of sexual harassment was not impressive. There is no persuasive evidence that effective action was ever taken to prevent any of the harassment.

■ The fourth factor plaintiff must show is that the unwelcome sexual harassment affected a "term, condition, or privilege" of her employment. Sexual harassment in the form of a sexually hostile work environment, to be actionable, must be sufficiently severe or pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment."

*Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. at 67, 106 S.Ct. at 2405.

To prove a hostile work environment which violates Title VII,

> [t]he plaintiff must show a practice or a pattern of harassment against her or him; a single incident or isolated incidents generally will not be sufficient. The plaintiff must generally show that the harassment is sustained and nontrivial.

*Moylan v. Maries County,* 792 F.2d 746, 749–50 (8th Cir.1986).

■ Plaintiff was employed with defendant for nearly fifteen years. Most of the harassment of which plaintiff complains occurred during the last four or five years of her employment. A review of the claimed harassment, coupled with plaintiff's supervisor's attitude toward women, leaves the impression that a general attitude of "boys will be boys" existed at the LeMone warehouse. The environment was, at best, incredibly insensitive, at worst, hostile. A review of the incidents described above can leave only one impression—that the LeMone warehouse was, as to plaintiff, a sexually hostile working environment. The sexual innuendo, comments, and attitudes were persistent and pervasive, even though not as outrageous as seen in some cases such as *Morris v. American National Can Corp.,* 730 F.Supp. 1489 (E.D.Mo.1989). Furthermore, efforts to correct such attitudes were half-hearted at best, and completely ineffective. The "boys will be boys" attitude prevailed. It permitted the juvenile, sexually hostile activity such as that described previously to thrive, even though it is inappropriate in the work place. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404.

Defendant produced numerous witnesses who testified that the LeMone warehouse, while not a perfect place to work, was free of an abusive and hostile atmosphere. (Tr. 3, 105–07; 3, 127; 3, 161.) However, the "boys will be boys" attitude was not seen as inappropriate by Haddock and some other supervisors. A supervisor who engaged in sexual harassment (Cheryl Crane's su-

pervisor) was allowed to remain in a supervisory position.

It has already been made clear that plaintiff was terminated based on the events of December 17, 1987, and thereafter, combined with her long and well-documented record of poor performance, tardiness, and absences. Plaintiff worked out of the LeMone warehouse. She was not there a long time each day. Plaintiff testified that the occasional harassment and cold treatment upset her and made her feel unwanted, and that her self-esteem had been damaged as a result. However, this court does not believe that a sexually hostile environment is what led plaintiff to be out-of-route, to cut wires that should have been spliced, or to lie about the job she performed. It may have affected her decision about whether to come to work early, but does not explain or justify late arrival and nonarrival. In other words, the sexually hostile environment did not cause or contribute to cause plaintiff to be fired; neither did it affect plaintiff's promotions or other job benefits.

### V. Remedies

■ Plaintiff may not recover damages in this circuit for humiliation and emotional suffering in a Title VII action, but may be awarded only the relief authorized by Title VII. *Muldrew v. Anheuser–Busch, Inc.*, 728 F.2d 989, 992 n. 2 (8th Cir.1984), *Baker v. Weyerhaeuser Co.*, 903 F.2d 1342 (10th Cir.1990).

There is a division of authority concerning whether nominal damages may be awarded a plaintiff in a Title VII lawsuit. Defendant cites *Swanson v. Elmhurst Chrysler Plymouth, Inc.*, 882 F.2d 1235 (7th Cir.1989) and *Bohen v. City of East Chicago, Indiana*, 799 F.2d 1180 (7th Cir. 1986) in support of its request that nominal damages not be allowed. In both of these actions, the appellate court denied One Dollar nominal damages where the plaintiffs could not show that violations of Title VII (which were found to exist) led to their termination. *Swanson*, 882 F.2d at 1239–40; *Bohen*, 799 F.2d at 1184. The court's reasoning in both cases was that Congress,

in enacting Title VII, provided only for equitable remedies thereunder and that nominal damages are *legal* relief in nature. *Id.*

This circuit, on the other hand, has required an award of nominal damages in a similar situation. In *Dean v. Civiletti*, 670 F.2d 99 (8th Cir.1982), the court found plaintiff entitled to recover nominal damages based on the district court's finding that plaintiff had been discriminated against in violation of Title VII, even though the violation had not resulted in any loss for which economic or injunctive relief is available under Title VII.

*Muldrew v. Anheuser–Busch, Inc.*, 728 F.2d 989 (8th Cir.1984) does not directly address the issue of nominal damages, it prohibits only the award of damages for "humiliation and emotional suffering." *Id.*, 728 F.2d at 992 n. 2. *Dean*, which mandated nominal damages in a Title VII case, was cited for that specific issue by the court *en banc* in *Fast v. School Dist. of City of Ladue*, 728 F.2d 1030, 1034 (8th Cir.1984). *Fast* was decided February 23, 1984; *Muldrew* was decided February 21, 1984. In this circuit, nominal damages are required in a case such as this, where plaintiff cannot recover for humiliation or emotional distress.

Thus, although plaintiff has proved a sexually hostile environment existed as to her, she has failed to prove her entitlement to economic or injunctive relief under Title VII, and cannot be awarded actual damages on the basis of emotional distress caused by a hostile environment, which did not result in her discharge. Nominal damages are appropriate to recognize a violation of rights when a monetary value cannot be attached. It is also a threshold which authorizes attorney fees. *Dean v. Civiletti*, 670 F.2d at 101. No other claim was asserted which would allow recovery of the other damages plaintiff claims to have suffered. No evidence was presented concerning the current environment at the LeMone warehouse; therefore, no injunctive relief is appropriate because plaintiff will not be reinstated.

Therefore, judgment will be entered for defendant on plaintiff's claim that she was discharged because of her gender and for plaintiff on her claim of a sexually hostile environment, and plaintiff will be awarded the sum of One Dollar ($1.00) in nominal damages, but judgment will not be entered herein until this court has ruled on plaintiff's request for attorney fees and costs.

IT IS, THEREFORE, ORDERED that within thirty (30) days hereof, plaintiff submit her claim for attorney fees and costs. It is further

ORDERED within twenty (20) days thereafter, defendant respond to plaintiff's request for attorney fees and costs.